Your Name: ___Shannon Marie McClough___

Address: ___2236 Ridgecrest Way, Pittsburg, CA 94565___

Phone Number: ___925-432-2901___

Fax Number: _____

E-mail Address: ___Sjordan1863@gmail.com___

Pro Se Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

Division   **x** San Francisco ☐ Oakland ☐ San Jose ☐ Eureka

| | |
|---|---|
| Shannon Marie McClough | Case Number ___21-cv03933-SK___ |
| Plaintiff, | **FIRST - AMENDED COMPLAINT** |
| vs. | (1) CALIFORNIA LAW AGAINST DISCRIMINATION; |
| University of California Berkeley | (2) AMERICANS WITH DISABILITIES ACT OF 1990, AS CODIFIED, 42 |
| and DOES 1-8, all of whose true names are | U.S.C. § 12112 to 12117 |
| unknown, INCLUSIVE, | **DEMAND FOR JURY TRIAL** |
| | Yes ☒   No ☐ |
| Defendant. | |

## PARTIES

Name:      Shannon Marie McClough

Address:      2236 Ridgecrest Way, Pittsburg, CA 94565

Telephone:      925-432-2901

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

Name:          University of California Berkeley

Address:       1111 Franklin Street 12th Floor, Oakland, CA 94604

Telephone:     800-207-1710

## JURISDICTION

1. My case belongs in federal court

   **X** under <u>federal question jurisdiction</u> because it is involves a federal law or right. AMERICANS WITH DISABILITIES ACT OF 1990, AS CODIFIED, 42 U.S.C. § 12112 to 12117 and CALIFORNIA LAW AGAINST DISCRIMINATION;

_____.

## VENUE

**X** a substantial part of the events I am suing about happened in this district.

## INTRADISTRICT ASSIGNMENT

a. Because this lawsuit arose in Alameda County, it should be assigned to the Northern *Division* of this Court.

## STATEMENT OF FACTS

Plaintiff Shannon McClough, 2236 Ridgecrest Way, Pittsburg, California 94565, allege the following:

## I.      NATURE OF THE ACTION

1. This is an action for relief from employment discrimination in violation of California Law Against Discrimination, Americans with Disabilities Act, and Equality Act.

2. I allege that Defendant University of California Berkeley, (collectively, "Defendants"), unlawfully discriminated against the plaintiff on the basis of my disabilities, including harassed and retaliated against me.

3. I further allege that Defendant policies, practices, and decisions—all arising from the UC Berkeley "WAY" they established and enforced had a disparate impact upon me based on my cancer.

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

4.  I further allege that Defendant denied me equal compensation based on cancer.

5.  I seek injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and costs as remedies for violations of my rights.

## II.    THE PARTY

6.  Shannon McClough is an African American female with a BA/AA degree in Management and Human Resources, along with over 17 years HR experience. I worked as a career Benefits Analyst 2 for Defendants, from approximately 6/27/16 to 9/18/20, and COVID Site Tester temporary from 9/29/20 to present, but ending soon.

7.   Upon information and belief, Defendant University of California, is an education institution that maintains 10 campuses employing approximately 200,000 individuals. Defendant University of California, Defendant UCB operates in Berkeley, California and all or most of the events alleged herein occurred while employed by Defendant in that office.

8.  At all times relevant herein, Defendant UCB had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

9.  Defendant UCB is also an "employer" within the meaning of the California Law Against Discrimination, Americans Disability Act, and Equality Act.

10. Defendant University of California Berkeley is liable for the acts of their employees.

11. Plaintiff Shannon McClough is informed and believe and thereon allege that at all time relevant herein, the defendant were responsible in some manner of the occurrences and injuries alleged in this complaint.

## III.    JURISDICTION AND VENUE

12. This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

U.S.C. § 1331, as this case involves questions of federal law.

13. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the party.

14. Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

15. I timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and Department of Fair Employment and Housing Enforcement Division, on Civil Rights. On or around May 29, 2020, the DFEH issued me Notices of Right to Sue.

16. I have timely filed this action and have complied with all administrative prerequisites to bring this lawsuit.

## V.   FACTUAL ALLEGATIONS

17. At all times material to this action, Plaintiff Shannon McClough were employed by Defendants as Benefits Analyst 2 in Defendants' University of California Berkeley office.

18. As part of the job, Plaintiff Shannon were responsible to interact with internal and external professionals to provide departments, faculty and staff with a broad range of benefits related services. Processed and managed FMLA and

Leaves of Absence requests. Collaborated on communications and resources on current, new and/or amended benefits programs. Maintained confidentiality of personnel data.

19. In or around June 2016, Sharon Johnson became the supervisor of Plaintiff Shannon McClough in the Benefits Department.

20. In or around August 2016, I provided a medical note to Sharon Johnson, informing her I had breast cancer and need to be excused from work 2 to 3 weeks for surgery on September 1, 2016. After learning I was recently diagnosed of cancer during a routine mammogram. Sharon Johnson approved the leave.

21. In or around September 2016, I returned to work and shared with supervisor Sharon Johnson I need multiple radiation treatments and take hormonal therapies 5 years or possibly for life.

22. In or around October 2016, I began radiation treatments for 26 sessions through December while working and training in the department. I was denied a good faith interactive process and denied a reasonable accommodation.

23. In or around November 2016, supervisor Sharon began adding more workload on to me while doing radiation treatments stating she didn't have anyone else to do the work.

24. In or around November 2016 to February 2017, Katie C. Jackson who is also employed by the defendant made a derogatory comment across the office were many overheard her state she didn't care if I had cancer and didn't care I was doing cancer treatments repeatedly. She pressed for me to leave the office to pick up a Denny's breakfast at that moment in a threatening tone. Another employee asked her to calm down because of her aggressive behavior. Katie continued to repeat she didn't care about my cancer. Katie repeatedly confronted me about my work schedule. Katie would ask why I wasn't working

8 hours, why am I late and demand I return to working 8 hours per day immediately, including asking me am I done with treatments to return to a regular schedule. Katie in a hostile tone asked me why I take 30 minute lunch breaks and requested to return to 1 hour because there is no such policy. Date of hire, Sharon allowed me to take half hour meal breaks and same with others in our department.

25. Between approximately November 2016 and February 2017, co-worker Sheila Vanderberg -Taliaferro is also employed by the defendant routinely made derogatory comments across the office asking if I were in pain or sick again from cancer treatments which one is it today, when I wasn't feeling well.

26. On more than one occasion Sheila would state how tired she was of hearing I wasn't feeling well.

27. Between approximately October 2018 and January 27, 2020, Sheila repeatedly harassed or threatening me to shut up, shhh and be quite, including telling me she didn't want to hear a sound, voice or word coming from me, and writing on eraser board shhh at my desk before arriving to the office.

28. Sharon and Labor Relations never reprimanded Katie and Sheila for their behavior, nor did they ask them to stop making these comments because they kept at it.

29. I complained to Labor Relations about Sheila and Katie statements and behavior. Each time, the defendant dismissed the complaints.

30. On December 26, 2016, my probation period ended.

31. In or around January 2017, supervisor Sharon added 110 departments to manage LOA/FML. Sharon and co-worker Elysee Paige Moore a retired employee from the defendant, asked to meet with me to discuss more work will be added, although I removed my jacket and both noticed the burns underneath my right arm. Sharon never asked about my well-being or how painful and

FIRST AMENDED COMPLAINT

PAGE 1 OF 23

tiring the treatments were. Both Sharon and Elyse stated I must take on the workload because my new hire probation period is still in effect. I feared for termination, if not.

32. In or around March 2017, supervisor Sharon Johnson announced at a team meeting she was hiring two Benefits Analyst 2, and one Administrative III to help with the workload. I complained to Sharon to reduce my workload for feeling overwhelmed. I pleaded how sore and tired my body became from the cancer treatments. Sharon stated she would post the positions as soon as possible.

33. In or around June 2017, supervisor Sharon Johnson announced at a team meeting she received nearly 500 applicants, but didn't like or wasn't qualified. Sharon continued on to say the workload will remain the same for me.

32. In or around August 2018, I met with Peggy Huston Chief Operation Officer who is employed with the defendants' to launch an investigation against Sharon Johnson if not, I have no other option to fill a discrimination charge to EEOC.

1. Sharon Johnson interfered with the hiring process for me to leave her department while enduring harassment, discrimination and retaliation.

2. Alicia Martinez who is employed by the defendants' admitted during the investigation she notified Sharon Johnson of all internal positions I applied.

3. Sharon Johnson stated she only intervene to provide references. Sharon went on to state "if I wasn't happy in her department, then she should help me find another position to leave" (transfer).

4. I never was contacted by any of the positions applied.

5. I confidentially contacted a hiring manager Ana Sanchez who work for the defendant, and suggested to not seek recruitment for an interview, because of the unease feeling of Sharon interfering with my progressing in the company.

6. In or around August 2018, I thought the interview was confidential for a second

round.

7. Sharon Johnson informed me - I wasn't hired for the position because I answered one of the questions in correctly. Sharon verbatim stated "Shannon didn't know what to do, if I didn't know the answer to a question". I asked Sharon how did she know I didn't get the position because I haven't heard back. Sharon stated trust her, I didn't get the position. The next day I received an email my application no longer considered.

8. Sharon Johnson was notified she was being investigated, and then her behavior changed for the worse against me. Sharon dislike for me began to show more and more.

9. Sharon began having unannounced meetings with me and Labor Relations to critique my work. I asked Sharon are you trying to fire me. Sharon shrugged her shoulders and looked at me in what do you think manner and walked away. My work was in order and Sharon was upset about that too.

10. Katie C. Jackson bragged to coworkers in the department stating she will do anything to protect Sharon. Katie also provided to the investigator, I never used the words "I want to live, health issues and heavy workload" during a few meetings with other witnesses to Sharon Johnson. Katie denied also she was a childhood friend of Sharon Johnson after repeatedly admitting to the department her eldest sister dated Sharon's deceased brother in the past.

11. On December 7, 2018, Euphemia Thomopulos Employee Labor Relations who were an employee of the defendants' concluded her investigation against Sharon Johnson of no wrong doings of violations of Reasonable Accommodation, Compensation policies, and allegation has been blocking the Plaintiff advancement within the University. Euphemia went on to say we do things the UC Berkeley "WAY", along with anyone who worked with UC in the past will return at a higher pay rate; regardless, of experience and education. Euphemia provided an example – a gardener leaves UC and rehired into HR

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

without experience or education will be paid at a higher rate than someone with 15 years' experience and education such as me. Euphemia stated after speaking with the hiring managers, they all said I had no experience in Human Resources is why I wasn't contacted.

12. I experienced more/worse harassment and retaliation after the conclusion of the investigation.

13. In or around September 2018, I filed EEOC/DFEH complaint against my manager Sharon Johnson and UC Berkeley because of the discrimination, harassment, and retaliation I have experienced in the Benefits Department.

14. In or around October 2018, I was removed from work on disability.

15. In or around November 2018, I returned to work with restrictions 2 days off per week through end of year for medical appointments.

16. In or around November 2018, Sharon and Clarity White Labor Relations who work for the defendant requested a meeting to discuss the investigation and to do an interactive process for the current medical note. During the meeting Sharon and Clarity stated they cannot offer reasonable accommodation. Euphemia and disability management both stated the same to me. Sharon shouted abruptly, nobody trained her how deal with employees with a serious health condition. Sharon was upset at me because the cancer treatments makes me sleepy and tired. I stated during my lunch break, I take naps on the 2nd floor at an unused desk to get through the day. Sharon said, "Oh my God! Shannon can't stay wake for 8 hours, this is crazy! I can't believe she's too tired after cancer treatments". Three days later the area where I took naps were disassembled.

17. In or around January 2019, Sharon added more workload onto me. I was taking on 242 departments solo. I reminded Sharon it's too much, but she refused to make any changes. Sharon stated she didn't have anyone else to do the work

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

and can't find any qualified candidates to hire.

18. In or around May 2019 Benefits Department moves to new location at University Hall at 2199 Addison Street #129, Berkeley, CA. I requested "**not**" to be seated near or share a cubicle with Katie and Sheila to Sharon. Sharon denied the request.

19. In or around August 2019, I returned to work from five months disability.

20. On another occasion, less than one hour of arrival to work after gone for 5 months, Sheila walks up to my desk and said "Shannon I do not want to hear a sound, word or your voice" in a threatening tone and walked away. Others in the office overheard.

21. On another occasion, less than two hours of return to work after gone for 5 months, I overheard Katie saying Shannon stinks at our shared cubical.

22. The more I complained, the more action was taken against me and my complaints went unresolved and were never addressed. In fact, my manager Sharon Johnson, who I have complained to numerous times and who is personally close to Katie Jackson, one of my co-workers who has victimized me, forced me to share a cubicle with Katie Jackson and another, two people who she knew routinely discriminated against and harassed me. I raised this issue again with her and asked her if I could work from one of the many open desks. She told me no and that I needed to work in the cubicle she assigned.

23. On January 23, 2020, just before 3 p.m., I believe Katie Jackson tampered with my water. I believe this because earlier in the day, I saw Katie Jackson leaving my desk quickly, and I overheard her asking Yvette Escobar if I left my key to access my snacks and water bottles desk drawer. Yvette Escobar said, "Yes, yes she did." I returned to my desk and removed the key.

24. Later, I accidentally left the key in my drawer again and walked away. When I returned, I noticed a white powdery substance and a red cut balloon or wrapper

near my desk. I also noticed Katie Jackson staring at the floor where I was sweeping up. Katie Jackson had also been watching me drink my beverages, which I thought it was weird.

25. When I drank my water that afternoon, my mouth became numb, my hands began to tingle, and I became dizzy. I immediately told Yvette Escobar who work for the defendants', about how I felt and that I thought someone put something in my water. Yvette Escobar, as she was looking over at Katie Jackson, asked me if the room was spinning. Aidaly Cintron who work for the defendants' approached me about a work-related issue and saw I was not feeling well. Both she and Yvette Escobar asked me if they should call 9-1-1. I declined, but I do not know why because I needed to be helped to my car by my co-worker Ruby Thomas around 3:20 p.m. I drove home unsafely shortly after.

26. In on around January 23, 2020, I e-mailed Sharon Johnson and Labor Relations, Theresa McLemore who worked for the defendants, about the incident, but I did not receive a response.

27. The next day I called out sick from work because I still felt awful with hangover symptoms. Sharon Johnson responded to my e-mail after, stating she did not know I was ill and would forward my e-mail to Labor Relations. She gave me no other instructions. She did not inquire any further about Katie Jackson. She took no steps whatsoever to protect me from Katie Jackson.

28. I returned to work on Monday, January 27, 2020, I went to my shared cubicle area. Approximately 7:50 a.m., Katie Jackson arrived, and I immediately became terrified, fearing for my life. It was shocking Sharon Johnson did not take any steps to address Katie Jackson tampering with my water, instead permitting Katie Jackson to come to work and sit mere feet from me without any investigation whatsoever. She did not even separate us.

29. As soon as Katie Jackson arrived, she started right in. She kept asking the me about and commenting about a plant I moved. I told her I removed it because it was evidence and told her to sit down as she was standing over me. She kept asking. Then I told her I knew she put something in my drink that made my body spin out of control and that thinking back, I believed she had been doing this for a while and this time she put too much in and went too far. I also told her I believe she had been putting something in my protein powder too. Katie Jackson just laughed. She never denied doing any of it.

30. Katie Jackson was standing over me, closely invading my space, and mocking me. She was very intimidating to me especially given what she did to me just days before. I did not threaten her. I did want her to stop bullying and harassing me and directed my comments to that. Considering how UC Berkeley and Sharon Johnson did nothing to protect me at any time, I had no choice but to use my words the way I did and to notify the authorities.

31. A few minutes later, UC Berkeley officer Hoskins arrived and I filed a formal complaint against Katie Jackson, explaining I feared for my life because she was spiking my water with some unknown drug or chemical. I even save the water as evidence because they wouldn't taken.

32. I waited around all day for Sharon Johnson to show for work to discuss why she took no action to protect me from Katie Jackson. But, Sharon Johnson did not show.

33. I received a call on February 6, 2020 from Sgt. Nicole Miller demanding my toxicology report. I was surprised because she called my personal cell. Sgt. Nicole Miller never provided an answer to how she came across my personal cell number and denied providing my mangers the toxicology report without permission. After suffering from being drugged or poisoned, I was tested. While the test did not detect drugs in my system, I did not receive a full panel.

In fact, the test only looked for a few basic drugs, such as cocaine. The test did not include many other chemicals or herbs that could have been used to poison me.

34. Around two weeks later, I spoke with HR Investigator Gabriel Suarez and told him everything I expressed above. I also explained I had complained to Sharon Johnson about Katie Jackson's work performance on January 10, 2020, that I had been experiencing some of the poisoning symptoms since then, and believe Katie Jackson had been tampering with my water and poisoning me somehow. I began feeling ill, feeling tired, getting headaches, and was out of sorts.

35. In or around February 2020, I was placed on administrative leave pending the investigation into me defending myself from Katie Jackson; Katie Jackson was not put on leave pending the investigation into whether she tried to poison me. And now, the intent is to suspend me without pay, simply for defending myself and complaining. I am still in shock and experiencing distress about how the entire situation has been mishandled, including action being taken against me, the true victim in all of this.

36. I am equally shocked that when I have complained about how Katie Jackson and others have discriminated against, harassed, bullied, and retaliated against me, nothing has been done to protect me, but action has been taken against me. The reasons for suspending me are dubious, especially considering Sheila Taliaferro has actually engaged in physical violence against a co-worker and was not terminated or suspended. I am being singled out.

37. My co-workers have routinely made derogatory comments about me having cancer and bullied me. I complained and complained, but nothing was done to prevent their discriminatory, harassing, and bullying behavior, emboldening them to continue their misconduct.

38. Also, because of my cancer, I asked for an accommodation through a decreased

workload, consistent with my medical restrictions. Instead, my workload was increased. I asked to telecommute full time consistent with my medical restrictions; part time was only permitted. I sought lateral transfers and promotions; I was blocked by management and the facility recruiter.

39. On March 11, 2020, Eugene Whitlock Vice Chancellor of Human Resources who work for the defendant, and Richard Lau Director retired employee who worked for the defendant, met with the me to state I falsely accused a co-worker of wrong doing because they had accessed my medical record blood test from their campus sergeant without my permission, and declared no drugs or chemical were found. I asked why wasn't Katie and I separated when I first notified you? They answered the University didn't know who to forward my complaint for assault. As a result of a false accusation, Eugene stated that I should be reprimanded because Katie and Sheila are afraid/fear to work with me.

40. On April 11, 2020, I returned to work after investigation. Carrie Ann Colton Director Human Resources stated she will not relocate my desk, that I will remain seated near Katie and Sheila. Carrie also stated a recommendation for 5 day suspension without pay or I can leave and the complaint will go away. If I stay, it will remain on my employee record for 5 years.

41. In or around June 2020, Plaintiff, Shannon receives a phone call from John Stevens Director and supervisor of Sharon Johnson to state he received a Right to Sue notice from the Department of Fair Employment & Housing, and cannot allow for me to continue to work with his team. John stated he spoken with Eugene and he agree of offering 6 months pay to walk away, and they will maintain my benefits through end of year 2020. John went on to say "Shannon can find another job easily during that time, and to care for my terminal ill husband too". John offered one week to think about the offer.

42. I rejected the offer and stated I need my job and benefits. I am 57, a black female with health issues, along with my husband dying, it's not a good time to start over. John said that's fine but when we return to the office you will continue to sit near Katie and Sheila. We will not relocate your desk. John also stated he wouldn't want to work with those two who keeps tormented him, why should I want to stay coercion/intimidate me to take the offer.

43. In or around May 2020 to August 2020, I asked my manager Sharon to place an order an office chair, keyboard and mouse like she did for the other team members working from home due to the pandemic. Sharon asked me to order my own and directed me to forms and classes I need to complete. I made numerous follow-ups and complaints of not receiving the office items, per Sharon directive.

44. In or around August 2020, Benefits department had a team zoom meeting and John Stevens joined us, I asked where my chair I have been waiting for months is. John stated he didn't approve it and neither did Sharon is why you haven't received a chair. Sharon then admitted she never approved a chair for me, but kept me running around chasing a chair that never existed.

45. In or around August 2020, I received a call from One WorkPlace for delivery of a chair on 8/26/20. I emailed Sharon to say a chair is being delivered thank you. The date of delivery was cancelled. I contacted One WorkPlace inquiring why no delivery. I was informed UCB contacted them to do not deliver the chair to Shannon McClough until further notice.

46. On September 16, 2020, I received the office chair, after numerous complaints of back and wrist pain, although I never received the ergo keyboard and mouse.

47. On September 18, 2020, I was informed my position is eliminated indefinite. (Terminated) Return the Defendant laptop, office chair and badge.

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

48. On September 29, 2020, I began working at the defendant COVID testing site temporary to maintain benefits for medical reasons.

49. I submitted many qualifying application at the University that were no longer considered after one or two days. One position applied as a Benefits Analyst 2 on another Berkeley campus. Application was denied within 24 hours.

50. On February 19, 2021, I received a call from Ashley Campos who work for the defendant at University Health Services.  Ashley left an employment opportunity message to call back. As a result, Ashley won't return my calls or respond to emails. Therefore, the defendant continues to retaliate after they received a Right to Sue notice and removed me from the Benefits department.

51. I have experienced discrimination, harassment, and retaliation from the defendant for over four years and have complained repeatedly about it. I was discriminated against and harassed because I had cancer, was denied a good faith interactive process, denied a reasonable accommodation, and retaliated against.

52. My co-workers have routinely made derogatory comments about me having cancer and bullied me. I complained and complained, but nothing was done to prevent their discriminatory, harassing, and bullying behavior, emboldening them to continue their misconduct.

53. Also, because of my cancer, I asked for an accommodation through a decreased workload, consistent with my medical restrictions. Instead, my workload was increased. I asked to telecommute full time consistent with my medical restrictions; part time was only permitted. I sought lateral transfers and promotions; I was blocked by management and the facility recruiter, and then terminated for filing a formal complaint with EEOC/DFEH.

# VI.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

Disability Discrimination (Disparate Impact) in Violation of

California Discrimination Law Article 12940 (a)

54. Plaintiff incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 83, above.

78. Article 12940 (a), prohibits employment practices that discriminate against persons on basis of their physical disability, mental disability and medical condition.

79. Plaintiff is informed and believe and thereon allege that Defendant UC Berkeley "WAY" policy and/practice had an adverse and disproportionate impact on her because of disability, Cancer.

80. Defendant UC Berkeley "WAY" practice was neither manifestly job-related nor consistent with business necessity. Less discriminatory alternatives existed to achieve Defendant stated business purposes.

81. As a direct, legal and proximate result of the discrimination, I have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

82. Defendant unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to my right to be free from discrimination based on Cancer.

83. I am entitled to reasonable costs of suit.

## SECOND CLAIM FOR RELIEF

Disability Discrimination (Hostile Work Environment) in Violation of California Discrimination Law Article 12940 (a)

84. I incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 53, above.

85. I was subjected to harassment by Defendant and employees, including Sharon Johnson, Katie C. Jackson and Sheila Vanderberg-Taliaferra, because of my disability, Cancer.

85. Plaintiff were subjected to verbal and written conduct, as well as an UC Berkeley "WAY" policy, by Defendant and employees, including Mrs. Johnson, Mr. Smith, Mr. Whitlock, and Carrie Ann Colton Director Human Resources who work for defendant.

86. Defendant and employees conduct was not welcome by me.

87. Defendant and employees conduct was undertaken because of my disability, cancer.

88. The conduct was so severe or pervasive in Plaintiff position would find her work environment to be hostile or abusive.

89. Plaintiff believe her work environment to be hostile or abusive as a result of the Defendant and employees'.

90. Management level employees knew, or should have known, of the abusive conduct. I provided management level personnel, including Mrs. Johnson, Mrs. White, and Mr. Lau, with information sufficient to raise a probability of disability harassment in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves complicit in the abusive conduct.

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

91. Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

92. As a direct, legal and proximate result of the discrimination, I have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

93. Defendant unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff right to be free from discrimination based on disability.

94. I am entitled to reasonable costs of suit.

## **THIRD CLAIM FOR RELIEF**

Retaliation in Violation of

California Discrimination Law Article 12940 (a)

95. I incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 83, above.

96. California Labor Code section 230(e) prohibits an employer from discharging or retaliating against an employee because of his or her status as a victim of crime or abuse, provided that the victim provides notice to employer of the status or the employer has actual knowledge of the status.

97. I made informal and formal complaints to Defendant and employees opposing Defendant unlawful, discriminatory employment practices based on disability and cancer.

98. As a result of my complaints, Defendant and employees took materially adverse actions against me, including, but not limited to, issuing disciplinary warnings, such as counseling and coaching forms; threats of termination;

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

reprimands by supervisors; and instituting position eliminated specifically at me because the defendant received a Right to Sue notice.

99. Defendant adverse actions constituted retaliatory workplace harassment.

100. Defendant retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under California Discrimination Law.

101. As a direct, legal and proximate result of Defendant retaliation, I have sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

102. I am entitled to reasonable costs of suit.

## FIFTH CLAIM FOR RELIEF

Discrimination in Violation of

THE AMERICANS WITH DISABILITIES ACT OF 1990,

AS CODIFIED, 42 U.S.C. § 12112 to 12117

103. I incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 83, above.

104. The Americans with Disabilities Act of 1990, makes it unlawful for an employer "to discrimination against people with disabilities based on cancer.

105. Likewise, the Americans with Disabilities Act requires that organizations with 15 or more employees comply with ADA guidelines. Employers must offer accommodations that do not cause "undue hardship" to the business to any employee who has a disability as defined by the ADA.

106. The Americans with Disabilities Act of 1990, makes it unlawful for an employer "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

accommodation to the physical or mental impairments of the employee or applicant.

107.   Defendant discriminated against me by treating me differently from my coworkers, including in departments assignment because of my disability with cancer.

108.   My cancer was the determining factor and/or a motivating factor in Defendant actions.

109.   As a direct, legal and proximate result of the discrimination, I have sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendant actions, I have suffered emotional distress, resulting in damages in an amount to be proven at trial. I further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

110.   Defendant unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to my right to be free from discrimination based on Cancer.

111.   I am entitled to reasonable costs of suit.

## **DECLARATORY RELIEF ALLEGATIONS**

112.   A present and actual controversy exists between Plaintiff and Defendant concerning my rights and respective duties. I contend that Defendant violated her rights under the California Law Against Discrimination, the American Disability Act, and Equality Act. I am informed and believe and thereon allege that the Defendant deny these allegations. Declaratory relief is therefore necessary and appropriate.

113.   I seek a judicial declaration of the rights and duties of the respective

parties.

## **INJUNCTIVE RELIEF ALLEGATIONS**

114.   No plain, adequate, or complete remedy at law is available to me to redress the wrongs addressed herein.

115.   If this Court does not grant the injunctive relief sought herein, I will be irreparably harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, I pray for relief as follows:

1.   For a declaration that Defendant actions, policies, and practices as alleged herein are unlawful;

2.   For lost wages and all other compensation denied or lost to me by reason of Defendant unlawful actions, in an amount to be proven at trial;

3.   For compensatory damages for my emotional pain and suffering, in an amount to be proven at trial;

4.   For liquidated damages;

5.   For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

6.   For an order enjoining Defendant from engaging in the unlawful acts complained of herein;

116.   For such other and further relief as this Court deems just and proper.

FIRST AMENDED COMPLAINT
PAGE 1 OF 23

1
2
3

## DEMAND FOR JURY TRIAL

4
5
6      **X**   Plaintiff demands a jury trial on all issues.
7
8
9          Respectfully submitted,
10
11   Date: _____        Sign Name: _____
12                                   Print Name:   Shannon Marie McClough
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_____ AMENDED COMPLAINT